**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**


FILED NOV 01 2012 MICHAEL J. ROEMER, CLERK WESTERN DISTRICT OF NY

**UNITED STATES OF AMERICA,**

                      **REPORT AND**
                      **RECOMMENDATION**
                      **11-CR-6210**

    v.

**Daryl E. Vonneida,**

         **Defendant.**

___

### Preliminary Statement

By text Order of Judge Charles J. Siragusa, dated December 23, 2011, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 15). On December 22, 2011, defendant Daryl E. Vonneida was indicted on fourteen counts of child pornography and unlawful transportation of minors. See Indictment (Docket # 14). Currently before the Court are defendant Vonneida's motions to (i) dismiss Counts 2 through 13 of the Indictment, (ii) suppress evidence seized pursuant to a search warrant or to obtain a <u>Franks</u> hearing, and (iii) suppress statements. (Docket # 26). The Government filed papers in opposition to defendant's motion. (Docket # 28). A suppression hearing was held on June 14, 2012, after which both the Government and defense counsel filed supplemental briefs. (Dockets ## 36, 37). The following is my Report and Recommendation as to the defendant's motions.

**Findings of Fact**

The Search Warrant: On September 14, 2011, New York State Police Investigator Joseph M. Kelly applied for a search warrant for 1636 Price Road, Montour Falls, New York 14865. See Search Warrant Application attached to Exhibit "C" annexed to Docket # 26. This application was granted and a search warrant was issued by Town of Montour Town Court Judge Speccio and was executed on that same date. See id. In his affidavit in support of the search warrant application, Investigator Kelly describes how the New York State Police became involved in an investigation of defendant Daryl Vonneida the day before, on September 13, 2011, when two thirteen and fourteen year-old brothers (hereinafter "the Victims," "Victim 1" or "Victim 2") came forward to be interviewed by the police regarding incidents that allegedly occurred between them and Vonneida. See Affidavit of Joseph M. Kelly (hereinafter "Kelly Aff.") attached to Exhibit "C" annexed to Docket # 26. The Victims described, *inter alia*, various trips they took with Vonneida, as well as multiple occasions upon which they spent the night at his home. During these trips and "sleep overs," the Victims described how Vonneida filmed various home movies and took photographs of them (i) wearing only extra small underpants, (ii) acting out "death" scenes and scenes where they were instructed to "die," (iii) masturbating under their underwear, and (iv) inadvertently exposing their penises. See id. The Victims also described

certain incidents in which Vonneida put their hands on his penis. See id. The Victims also stated that on every trip they took with Vonneida he "would bring two black leather bags with him" which contained "camera equipment" and "a smaller video camera." Id.

In his affidavit, Investigator Kelly stated that after obtaining the statements from the Victims and the Victims' mother, he conducted an investigation into Vonneida and confirmed some of the information that they had given, namely Vonneida's address (1636 Price Road, Montour Falls, New York), his age, and his automobiles. Id. Kelly stated that based on his "training, experience and consultation with other law enforcement officers/agents" the facts discovered through his investigation "lead me to believe that there is reason to believe that" Vonneida possesses evidence of child pornography at his 1636 Price Road residence. Id.

Execution of the Search Warrant: On September 14, 2011 at approximately 3:30 p.m., members of the New York State Police and the Federal Bureau of Investigation ("FBI") executed the search warrant at 1636 Price Road. The officers arrived in several different cars and parked in front of Vonneida's house on 1636 Price Road. As law enforcement approached the residence, they observed defendant Vonneida and his wife step onto the porch. See June 14, 2012 Hearing Transcript (hereinafter "6/14/12 Tr.") (Docket # 35) at p. 8. New York State Police Investigator Chad

3

DeWeese testified that he introduced himself and FBI Agent Mayfield to the defendant, asked him if he was Darryl Vonneida, and Vonneida responded "yes." Id. at p. 9. Investigator DeWeese then asked Vonneida if he would step off the porch and speak with the officers, and Vonneida complied. Id. The officers then walked with Vonneida across the front lawn toward DeWeese's unmarked police vehicle on the street and DeWeese asked him if he knew why the police were at his house and "[h]e answered in the affirmative that he knew why we were there." Id. at pp. 9-10. DeWeese then told Vonneida the names of the two victims, and Vonneida "indicated he knew what I was talking about, that he was affirming that it was about these boys and about the images that were taken of them." Id. at p. 38. Up until this point, Vonneida had not yet been read his Miranda rights. Id. DeWeese testified that Vonneida was not restrained in any way as they walked across Vonneida's front lawn toward the street. Id. at p. 10. DeWeese testified during the walk across the lawn toward the car on the street Vonneida began to make incriminating statements and Vonneida was not free to leave "[d]uring the walk to the car." Id. at p. 30. DeWeese testified that once Vonneida made incriminating statements he was not free to leave because the police "had enough that I probably would say he was in custody... He was not free to go." Id. at p. 39. According to DeWeese, the walk from the porch to the car on the street took "[s]econds," as it was approximately "20 yards from the porch to

4

the road." Id. at p. 36. FBI Special Agent Mayfield also testified that the walk took "no more than a minute." Id. at p. 64.

DeWeese observed that "Vonneida appeared shaken, upset" and so DeWeese "asked if he wanted to sit down, and he sat on the passenger's side of my vehicle" while the car door remained open. Id. at pp. 10-11. DeWeese testified that Vonneida "was tearful. He was not walking erect. He was kind of hunched over, kind of a deflated posture and tearful." Id. at p. 56. DeWeese spoke with Vonneida as he sat in the police car, and Vonneida began "giving answers that were implicating himself in our investigation, so he was advised of his Miranda warnings." Id. at p. 11. Specifically, DeWeese testified that "[o]nce he affirmed that, 'Yes, I took the pictures of the boys,' we Mirandized him." Id. at p. 40. DeWeese read Vonneida his rights by reading the five rights directly from DeWeese's New York State Police Miranda warning card. Id. at pp. 12-14. After reading each line, DeWeese asked Vonneida if he understood the right that had been read to him. Vonneida responded that "yes" he understood each right. Vonneida then responded that he understood his rights but wished to speak with the officers. Id. at p. 15. DeWeese testified that he read Vonneida his Miranda rights "[w]ithin minutes" of first encountering him and that Vonneida was composed when he was read his rights. Id. at pp. 14, 56-57.

5

DeWeese proceeded to question Vonneida. DeWeese testified that Vonneida never refused to answer questions nor had trouble answering questions. Id. at pp. 15-16. Within two or three minutes of reading Vonneida his rights, DeWeese began driving Vonneida in his police vehicle to the New York State Police Barracks in Horseheads, New York. Id. at p. 16. DeWeese testified that Vonneida became "more composed" once they left Price Street and started heading to the police barracks. Id. at p. 56. According to DeWeese, Vonneida was not under arrest at that time, was seated in the front seat on the passenger's side and was not handcuffed or restrained in any way other than wearing his seat belt. Id. at p. 17. DeWeese testified that the drive to the police barracks took approximately twenty minutes, and DeWeese continued to ask Vonneida questions during the twenty minute drive. Id. During the drive, Vonneida never indicated that he did not wish to speak with DeWeese, never refused to answer any of his questions and never asked for an attorney. Id. at pp. 17-18.

Questioning at the Police Station: Upon arriving at the police barracks, DeWeese, Agent Mayfield (who traveled in the back seat of DeWeese's vehicle with DeWeese and Vonneida on the way to the police station) and Vonneida walked to DeWeese's office, which DeWeese described as "small." Id. at pp. 18-19. Once seated in DeWeese's office, DeWeese continued asking Vonneida questions. Vonneida was not restrained, did not refuse to answer any questions

and did not ask for an attorney. Id. at p. 20. At 4:40 p.m., after approximately 43 minutes of questioning, Vonneida indicated that he needed to use the restroom, upon which DeWeese ceased the questioning and escorted Vonneida – who was not restrained or handcuffed – to the lobby area where the restroom is located. While walking to the lobby, DeWeese, Mayfield and Vonneida encountered a woman – who was later determined to be Vonneida's wife – who told Vonneida not to speak with the police. Id. at p. 21. Vonneida and the woman then "hugged and conversed" in the lobby, and the police did not prohibit them from touching one another or from speaking with each other. Id. at p. 22. After about one minute, Vonneida used the restroom and then returned to the lobby and spoke again with his wife in the lobby. Id. at p. 22-23. Vonneida and his wife interacted for about one minute, and then Vonneida, DeWeese and Mayfield returned to DeWeese's office. Id. at p. 24. DeWeese resumed asking Vonneida questions, but after a few minutes, at approximately 4:54 p.m., Vonneida stopped answering his questions and stated "I think I need an attorney." Id. at pp. 24, 28. At that point, "[t]he interview stopped." Id. at p. 29. DeWeese and Mayfield then escorted Vonneida to the "patrol portion" of the station, "secured [him] to our bench" and placed Vonneida under arrest. Id.

### Discussion

I. <u>Motion to Dismiss</u>: Vonneida has moved to dismiss certain

7

counts of the Indictment. (Docket # 26). Counts 2 and 4 of the Indictment charge Vonneida with the production of child pornography and counts 6 through 13 charge Vonneida with possession of child pornography. All of these counts are based on the grand jury's consideration of eight DVDs and a VHS cassette law enforcement seized from Vonneida and all of them require Vonneida to either possess or produce media that meets the statutory definition of "child pornography." Vonneida argues at length that the DVDs and videos do not depict minors engaged in sexual activity or in sexually explicit conduct, nor do they depict the minor victims masturbating or in the lascivious exhibition of their genitals. See Affirmation of Jeffrey L. Ciccone, Esq. (hereinafter "Ciccone Aff.") annexed to Docket # 26 at ¶¶ 11-18. With respect to the "lascivious exhibition of the genitals," Vonneida relies on the multi-factored analysis set forth in United States v. Dost, 636 F. Supp. 828 (S.D. Cal. 1986) and endorsed by the Second Circuit as "useful" in United States v. Rivera, 546 F.3d 245, 250 (2d Cir. 2008). Based on Vonneida's detailed analysis of what is depicted in the seized media as compared to the statutory definition of child pornography, Vonneida argues the possession and production charges must be dismissed.

Vonneida's arguments are non-frivolous and cognizable, but are inappropriate at this particular juncture of the litigation. "It is well established that an indictment that is valid on its face

cannot be dismissed on the grounds that it is based on inadequate or insufficient evidence." United States v. Young, 10-CR-6211(L), 2012 WL 5245305, at *3 (W.D.N.Y. Oct. 19, 2012)(citing United States v. Williams, 504 U.S. 36, 54 (1992); United States v. Calandra, 414 U.S. 338, 345 (1974); United States v. Casamento, 887 F.2d 1141, 1182 (2d Cir. 1989)). Here, the Indictment is valid on its face and is based on a finding of probable cause returned by a duly constituted grand jury. Vonneida's arguments in support of dismissal are based upon his interpretation of the same evidence and law presented to and considered by the grand jury. Under these circumstances, whether the media allegedly possessed and produced by Vonneida contains child pornography is a question of fact for the jury. United States v. Goodale, 831 F. Supp. 2d 804, 808 (D. Vt. 2011)("[I]t is not this Court's role to second-guess the Grand Jury's indictment [charging defendant with possession of child pornography] at this [pretrial] stage of the proceedings."); see United States v. Frabizio, 459 F.3d 80, 85 (1st Cir. 2006)("[W]hether a given depiction is lascivious is a question of fact for the jury."); see also United States v. Rivera, 546 F.3d at 253 (approving jury instructions on issue of lasciviousness of image).[1]

---

[1] Vonneida could also move for a judgment of acquittal and argue that the evidence presented by the Government was insufficient to prove beyond a reasonable doubt that the media at issue constituted child pornography. See, e.g., United States v. Steen, 634 F.3d 822, 825 (5th Cir. 2011)(reversing trial court's

Vonneida makes a similar argument in support of his motion to dismiss counts 3 and 5 of the Indictment. These counts charge Vonneida with "Transportation of Minors" in violation of 18 U.S.C. § 2423(a), for allegedly knowingly transporting two minors from New York State to the State of Pennsylvania with the intent that the minors engage in sexual activity. See Indictment (Docket # 14). According to Vonneida, "these videos do not contain sexually explicit conduct, and thus do not satisfy the requirements of the child pornography laws." See Ciccone Aff. at ¶ 20. Therefore, Vonneida argues, they "are not a 'sexual activity' for which a person could be charged." Id. Again, this is an argument based on the content or sufficiency of the evidence and is a question that must be determined by the jury.

For the above reasons, it is my Report and Recommendation that all of the challenged counts in the Indictment are legally sufficient and Vonneida's motion to dismiss these counts of the Indictment should be **denied without prejudice to renew**.

II. <u>Motion to Suppress Fruits of the Search Warrant</u>: Vonneida seeks suppression of all physical evidence that was seized from his residence at 1636 Price Road pursuant to the execution of a search warrant on September 14, 2011. (Docket # 26). Vonneida asserts that New York State Police Officer Joseph Kelly's affidavit in

---

denial of defendant's motion for a judgment of acquittal because the government's evidence failed to prove that the images at issue were child pornography).

support of the search warrant[2] did not "provide any basis upon which to conclude that evidence of the alleged crime would be found at 1636 Price Road." See Ciccone Aff. at ¶ 32.

Probable cause exists when, given the totality of the circumstances, a reasonable person could believe "there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Ponce, 947 F.2d 646, 650 (2d Cir. 1991)(quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). In support of the search warrant application, Officer Kelly attached to his affidavit signed statements taken from Victim 1 and Victim 2 during the investigation on September 13, 2011. Both Victims were teenagers and their statements set forth detailed information about Vonneida and the unlawful activity he would engage in with the Victims, which included (i) taking photographs and videos of them engaging in forced sexual activity (masturbating), (ii) taking photographs and videos of their exposed penises, and (iii) placing their hands on Vonneida's penis. In Victim 2's statement, he described the inside of Vonneida's residence, his computer equipment and where Vonneida's laptop computer and tower computers were kept in the house. Victim 2 also stated that when he and his brother stayed overnight at Vonneida's house, Vonneida would take pictures and videos of them and then

---

[2] See Affidavit of Joseph M. Kelly attached to Exhibit "C" annexed to Docket # 26.

"would hook his camera to the laptop and play on the computer all night." Based on the totality of the circumstances as set forth in Officer Kelly's affidavit, there was a "fair probability" to believe that contraband, including evidence relevant to the possession and production of child pornography, would be found in Vonneida's residence. Illinois v. Gates, 462 U.S. at 238.

Vonneida further asserts that Kelly's affidavit contained false information and argues that a Franks hearing should be held.[3] Specifically, in one of the Victim's statements attached to Officer Kelly's affidavit in support of the search warrant application, the Victim states that Vonneida "has 3 tower computers at his house." See Exhibit "C" annexed to Docket # 26. Vonneida claims that he "only owned a single Dell tower computer." See Ciccone Aff. at ¶ 37. Vonneida contends that considering "the blatantly incorrect references" to the computers in Kelly's affidavit, "it appears possible that the 13-year-old victim never saw a computer at Mr. Vonneida's residence at all, but rather was susceptible to a suggestion by the interviewing officers." Id. at ¶ 38. Vonneida maintains that "[w]ithout reference to the computer equipment, law enforcement could not demonstrate any basis upon which to believe that evidence of the alleged crimes would be found at 1636 Price Road" and, therefore, it is possible that "the officers influenced the victim's testimony by suggesting the observation of the

---

[3] See Franks v. Delaware, 438 U.S. 154 (1978).

12

computer equipment." Id. at ¶ 41. Vonneida asserts that "the Court should conduct a Franks hearing to determine the circumstances under which the victim provided the false information relating to the laptop computer." Id. at ¶ 42.

The Second Circuit has instructed that:

> To be entitled to a Franks hearing, a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding. If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a Franks hearing.

United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998)(internal citations omitted).

Vonneida has clearly failed to make the required showing necessary for the Court to order a Franks hearing. Even assuming Vonneida could show a "deliberate falsehood or reckless disregard for the truth," given the other evidence set forth in the Kelly affidavit, the information about the type or number of computers in the residence was hardly essential to a judicial finding of probable cause. United States v. Longo, 70 F. Supp. 2d 225, 254 (W.D.N.Y. 1999)(where alleged misrepresentations and omissions in the supporting affidavit were "inconsequential to the finding of probable cause," Franks hearing unnecessary).

For the above reasons, it is my Report and Recommendation that

Vonneida's motion to suppress the items seized pursuant to the search warrant should be **denied**.

III. <u>Motion to Suppress Statements:</u> Vonneida seeks to suppress statements he made to law enforcement before and after he was read his <u>Miranda</u> rights on September 14, 2011. (Docket # 26). As to statements he made to law enforcement <u>before</u> he was advised of his <u>Miranda</u> rights, Vonneida asserts that he made these statements "while he was in custody and while replying to questions designed to elicit an incriminating response." See Defendant's Supplemental Memorandum (hereinafter "Def. Supp. Memo") (Docket # 36) at p. 4. As to the statements he made <u>after</u> he was given <u>Miranda</u> warnings, Vonneida argues that they should also be suppressed because they "were the product of a deliberate two-step strategy designed to deprive Vonneida of his Fifth Amendment rights." <u>Id.</u> at p. 7.

A. <u>Custody</u>: Law enforcement officers are required to give <u>Miranda</u> warnings before questioning a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The admissibility of Vonneida's statements before he was placed in the state police vehicle depends on whether Vonneida's right to warnings required by <u>Miranda</u> had attached.

"Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the

14

authorities affirmatively convey the message that the defendant is not free to leave." United States v. Mitchell, 966 F.2d 92, 98 (2d Cir. 1992). Thus, even in the absence of an actual arrest, an individual shall be deemed to be in custody when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." United States v. Kirsh, 54 F.3d 1062, 1067 (2d Cir. 1995)(citations omitted), *cert. denied*, 516 U.S. 927 (1995); see United States v. Hall, 421 F.2d 540, 545 (2d Cir. 1969)("[I]n the absence of actual arrest something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."). The test for custody is an objective one based on the totality of circumstances surrounding the particular encounter at issue. See Stansbury v. California, 511 U.S. 318, 323 (1994). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). In United States v. Newton, the Second Circuit explained the proper test for determining whether an individual is "in custody" for purposes of complying with Miranda. 369 F.3d 659 (2d Cir. 2004). The court in Newton adopted a two part analysis: (1) the court must determine "whether a reasonable person would have thought he was free to leave," (id. at 672); and, if not, (2) "whether his freedom

15

of action has been curtailed to a degree associated with formal arrest" (id. at 671 (citations and internal quotation marks omitted)).

After careful review of the totality of the circumstances surrounding the events of September 14, 2011, and after consideration of the various indicia of "custody," I conclude that Vonneida was not in custody during the brief walk from his porch to the police vehicle. Accordingly, the statements he made during that time were not the result of custodial interrogation and Miranda warnings were not required. To be sure, there were some coercive aspects present during the brief period of time in question. Vonneida had no warning or notice that law enforcement was going to be arriving at his residence. The sheer number of police vehicles (four or five) and the number of officers (five or six) approaching or standing on his property would have conveyed the message to Vonneida he was the target of a police investigation. Whatever doubt remained would have been dispelled when DeWeese began the encounter by identifying the two minor victims he was interested in asking Vonneida about. Thus, it is plausible that Vonneida felt that he was "seized" to the extent he could not ignore the police or go back in his house.

But the Court's task here requires more. For purposes of a defendant's Miranda rights under the Fifth Amendment, custody requires more than simply a seizure. "[A] court must ask whether,

16

in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." United States v. Newton, 369 F.3d at 672. Miranda's safeguards "become applicable <u>as soon as</u> a suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 440 (1984)(emphasis added, internal quotation marks and citation omitted). Accordingly, the critical issue before the Court is whether a "reasonable person would have understood that his interrogation was being conducted pursuant to arrest-like restraints." In Vonneida's situation, this critical issue arises only during the few moments after Vonneida stepped off the porch, walked with DeWeese and Mayfield across the front lawn towards Price Road and then accepted DeWeese's invitation to gather himself by sitting in the front passenger seat of a police vehicle with the car door open and his feet outside of the vehicle. During this discrete period of time I conclude that Vonneida's freedom of movement or action was never curtailed or restricted to a degree associated with formal arrest. He was never advised he was under arrest. He was never frisked. No firearms were drawn or pointed. Vonneida was never restrained or handcuffed. See United States v. Newton, 369 F.3d at 676 ("Handcuffs are generally recognized as a hallmark of a formal arrest."). The questioning itself was not in the inherently coercive atmosphere of a police station interview

17

room, but in the more familiar location of Vonneida's own front yard and street. His placement in the police car was by his own choice. Because Vonneida appeared "shaken" and "upset," DeWeese asked if he wanted to sit in the front seat of the police vehicle with the door open, a seating arrangement not typically associated with formal arrest. The questioning at issue was not prolonged or coercive interrogation. Indeed, upon hearing some initial admissions, and before conducting any follow up questioning, Investigator DeWeese immediately read Vonneida his Miranda warnings.

In sum, I conclude that during the discrete and brief period of time at issue, a reasonable person would not have understood that his interrogation was being conduct with "arrest-like" constraints. Accordingly, Vonneida was not subjected to custodial interrogation for purposes of Miranda.

B. Interrogation After Miranda Warnings: Vonneida does not dispute that DeWeese read him Miranda warnings after he was seated in the front passenger side of the police vehicle. Nor does Vonneida dispute that he waived his Miranda rights and agreed to talk with law enforcement. Instead, relying on United States v. Capers, 627 F.3d 470 (2d Cir. 2010), Vonneida argues that law enforcement deliberately utilized a "two-step strategy" of eliciting unwarned admissions in order to facilitate a postwarning confession. See Defendant's Supplemental Memorandum (Docket # 36)

18

at pp. 7-21. However, the Court need not address the merits of Vonneida's "two-step strategy" argument because his argument requires the second confession to be a "fruit" of an earlier interrogation where a <u>Miranda</u> violation occurred. Because I have determined Vonneida's initial statements to law enforcement were not subject to the requirements of <u>Miranda</u> because Vonneida was not in custody, I need not determine whether DeWeese deliberately engaged in a two-stage interrogation.

For the reasons set forth above, it is my Report and Recommendation that Vonneida's motion to suppress statements he made to law enforcement on the day of his arrest be **denied**.

### Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to (i) dismiss Counts 2 through 13 of the Indictment (Docket # 26) be **denied without prejudice to renew,** (ii) suppress physical evidence seized on September 14, 2011 pursuant to the search warrant (Docket # 26) be **denied,** and (iii) suppress statements he made to law enforcement on September 14, 2011 (Docket # 26) be **denied.**

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: November 1, 2012
       Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated:    November 1, 2012
          Rochester, New York

---

[4]    Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).